**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

Case No. 1:16-cv-20245-UU

THOMAS E. PEREZ
Secretary of Labor,
United States Department of Labor,

Plaintiff,

v.

COMMODITY CONTROL CORP., *et al.*,

Defendants.
_______________________________________/

**ORDER ON MOTION FOR SUMMARY JUDGMENT**

THIS CAUSE is before the Court upon Plaintiff Secretary of Labor's Revised Motion for Partial Summary Judgment, D.E. 57. The Motion is fully briefed and ripe for disposition.

THE COURT has reviewed the pertinent portions of the record and is otherwise fully advised in the premises. For reasons set forth below, Plaintiff's Motion is DENIED.

## I. Procedural Background

On January 20, 2016, Plaintiff filed his Complaint, alleging claims against Defendants, Commodity Control Corporation ("Commodity Control"), David J. Pilger ("David Pilger"), the estate of William M. Pilger (the "Estate"), and the Commodity Control Employee Stock Ownership Plan and Trust (the "ESOP"), for violations of the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 101, *et seq.* ("ERISA"). D.E. 1. In short, this action stems from the sale of shares by David and William M. Pilger, who are the former owners of Commodity Control, to their employees through the ESOP, which is an employee pension benefit plan as defined under ERISA. *Id.* ¶¶ 9-10.

On April 1, 2016, Defendants moved to dismiss Plaintiff's Complaint, in part because Plaintiff filed this action beyond the six-year statute of limitations period under ERISA. D.E. 25. On April 18, 2016, Plaintiff responded to Defendants' motion, arguing that his ERISA claims were not time-barred because Defendants knowingly and voluntarily entered into a tolling agreement before the expiration of ERISA's limitation period. D.E. 28.

On May 3, 2016, the Court granted in part and denied in part Defendants' motion, thereby dismissing Plaintiff's Complaint without prejudice, because while Plaintiff *could* state a claim by alleging that the parties signed a tolling agreement, Plaintiff failed to include these allegations in his Complaint and failed to attach to the Complaint the alleged agreement D.E. 36.

On May 15, 2016, Plaintiff filed his Amended Complaint, D.E. 38, which includes three Counts, each alleged against all Defendants. Count I alleges a claim for breach of fiduciary duty under 29 U.S.C. §§ 1104(a)(1)(A), (B) and (D). Counts II alleges a claim for engaging in non-exempt prohibited transactions in violation of 29 U.S.C. §§ 1106(a)(1)(A), (B) and (D). Count III alleges a claim for engaging in prohibited transactions in violation of 29 U.S.C. §§ 1106(b)(1) and (b)(2).[1]

On May 25, 2016, Defendants filed their Answer and Affirmative Defenses, raising the affirmative defenses that: (1) Plaintiff's Amended Complaint fails to state a claim; (2) Plaintiff's claims are barred by the statute of limitations or repose; (3) Plaintiff's claims are barred by the doctrine of laches; and (4) Plaintiff failed to satisfy conditions precedent to commence an action against the Estate of William Pilger. D.E. 39.

After the close of discovery, Plaintiff moved for summary judgment on each of his three ERISA claims, seeking judgment in his favor and requesting that the Court, thereafter, "hold an

[1] Courts routinely refer to 29 U.S.C. § 1104 as ERISA § 404, 29 U.S.C. § 1106 as ERISA § 406, and 29 U.S.C. § 1108 as ERISA § 408. The Court will use both citations interchangeably.

evidentiary hearing solely for purposes of determining the appropriate measure of losses to the ESOP."[2] D.E. 57 p. 2. Defendants oppose Plaintiff's Motion. D.E. 61.

## II. Factual Background

The following facts are undisputed, unless otherwise indicated.

Commodity Control is a wholesaler and exporter of dry cleaning chemicals and supplies, which is headquartered in Miami, Florida. D.E. 52 ¶ 2. Defendants David and William Pilger were equal co-owners of Commodity Control until they sold their shares to the ESOP in 2009. *Id.* ¶ 6. Because William Pilger is deceased, Plaintiff brings this action against his Estate.

In or about September 2008, David and William Pilger began exploring means to divest themselves of their ownership stake in Commodity Control and, as part of this effort, explored the possibility of selling Commodity Control to its employees using an ESOP. *See id.* ¶ 12. To assist in establishing the ESOP, David Pilger interviewed two service providers, Philip Talbert ("Mr. Talbert") and Tracy A. Lamb of RSM McGladrey, Inc., an independent consulting firm, ("Ms. Lamb"), both of whom he found through their advertisements in an ESOP Association newsletter. *Id.* ¶ 11.

On or around September 28, 2008, David Pilger engaged Ms. Lamb to perform the valuation of the fair market value of a 100% interest in the company, for purposes of establishing the ESOP. *Id.* ¶ 12. David Pilger also hired Mr. Talbert to administer the ESOP. *Id.* ¶ 11.

---

[2] Plaintiff did not move for summary judgment on Defendants' affirmative defenses in his initial Motion, but instead only addressed these affirmative defenses in his Reply. D.E. 57; D.E. 63 pp. 9-11. The Court will not consider arguments raised for the first time in a reply brief. *Herring v. Sec'y, Dep't of Corr.*, 397 F.3d 1338, 1342 (11th Cir. 2005) ("As we repeatedly have admonished, '[a]rguments raised for the first time in a reply brief are not properly before a reviewing court.' (internal citation omitted)); *Eisenberg v. Shendell & Assocs., P.A.*, No. 10-CV-62149-JIC, 2011 WL 1233253, at *2 (S.D. Fla. Mar. 31, 2011) ("Arguments not properly presented in a party's initial brief or raised for the first time in the reply brief are deemed waived."). In any event, Plaintiff's arguments are not persuasive.

Ms. Lamb conducted an appraisal of Commodity Control. In making her appraisal, Ms. Lamb considered, among other things, the previous four and a half years of compiled unaudited financials of the Company (i.e., from January 1, 2003 to June 30, 2008), as well as information provided to her orally during her interviews with David Pilger. *Id.* ¶ 14.

On December 10, 2008, McGladrey issued its valuation report, prepared by Ms. Lamb (the "Valuation Report"). D.E. 52-3. The Valuation Report concluded that, as of June 30, 2008, the fair market value of 100% of Commodity Control's stock was $9,193,000 (or $22.75 per share) on a control, non-marketable basis. D.E. 52 ¶ 22.

David Pilger testified that he was disappointed with the $9,193,000 valuation in Ms. Lamb's Valuation Report, as he anticipated Commodity Control to have a valuation of approximately $12 or $13 million. *Id.* ¶¶ 38, 40. When David Pilger ultimately facilitated the sale of Commodity Control to the ESOP based on the $9,193,000 valuation, David Pilger believed he was he was "taking heroic action" and giving his employees "a hell of a deal." *Id.* ¶ 38.

On December 30, 2008, Commodity Control established the ESOP, which was to become effective as of January 1, 2008. *Id.* at ¶ 4. Both David and William Pilger are named as Trustees to the ESOP and, as Trustees, are responsible for the management and maintenance of the ESOP assets and are required to value such assets at fair market value. *Id.* David Pilger has served as a Trustee since the ESOP's inception on January 1, 2008, and William Pilger served as a Trustee from the ESOP's inception until his death. *Id.* ¶¶ 4, 6. In addition, Commodity Control is named in the ESOP's Plan Documents as the Employer, Plan Sponsor and Plan Administrator to the ESOP. *Id.* As Plan Administrator, Commodity Control is itself a fiduciary and "party in interest" under ERISA. *See id.*

Through two transactions, on January 22, 2009 and February 22, 2009, David Pilger and William Pilger sold 100% of their Commodity Control stock to the ESOP, for a total sum of $9.1 million. The stock purchase prices for both sales were based on Ms. Lamb's Valuation Report, which valued Commodity Control's stock with a June 30, 2008 valuation date; in other words, the purchase prices were based on a valuation date nearly seven months before the January and February 2009 transactions. *Id.* ¶¶ 10(b), 10(c), 23.

On January 22, 2009, Defendants caused the ESOP to purchase 22,000 shares of the Commodity Control common stock from David and William Pilger, at the cost of $22.75 per share, or for to a total sum of $500,500 (the "First Stock Purchase"). *Id.* ¶ 10(b). By the time of the First Stock Purchase, David Pilger knew that Commodity Control had not achieved the $17 million in sales for 2008 projected by Ms. Lamb in the Valuation Report. *Id.* ¶ 32. Nonetheless, David Pilger testified that the June 2008 figures, which were used in the Valuation Report, remained the most accurate figures available to the company, as Commodity Control's integrated systems, which the company used to keep track of inventory and sales on a routine basis, did not account for "pilferage," "spoilage," or other factors that could render the inventory and sales figures inaccurate. D.E. 60-2 at 53:2-23.

On February 22, 2009, Defendants caused the ESOP to enter into the second Stock Purchase Agreement and Pledge Agreement (the "Second Stock Purchase"). D.E. 52 ¶ 10(c). In the Second Stock Purchase, the ESOP purchased an additional 378,000 shares of Commodity Control's common stock from David and William Pilger, for $22.75 per share or a total of $8,599,500. *Id.* These 378,000 shares represented the remaining balance of 100% of the issued and outstanding shares of the company. *Id.*

At the time of the Second Stock Purchase, the ESOP made a cash payment on closing in the amount of $15,783, which was derived from funds in the ESOP Trust. *Id.* ¶ 10(d). The remainder of the stock purchase was financed by promissory notes from the ESOP to the Trustees/Defendants totaling $8,583,717 (the "Promissory Notes"). *Id.* The Promissory Notes are collateralized by the unallocated shares of Commodity Control's stock and require the ESOP to make monthly payments of principal and interest over a ten (10) year term, with any unpaid balance due at the end of such period. *Id.* Initially, the Promissory Notes required interest payments of 4% per annum, but as of January 1, 2012, the notes were amended so that the rate of interest is 1.4% per annum. *Id.*

Commodity Control also made a contribution of $586,080.43 to the ESOP for the 2008 plan year, which was allocated to all eligible participants' "Other Investment Accounts" in cash. *Id.* ¶ 10(a).

Sometime in February 2009, Commodity Control, David Pilger and William Pilger executed a Preferred Stock Warrant Agreement, based on Mr. Talbert's advice. D.E. 52 ¶ 48; D.E. 60 ¶ 48. Plaintiff contends that the evidence shows that Commodity Control granted David and William Pilger stock warrants to purchase 5,000 shares (2,500 shares for David and William, respectively) of Company Series A Preferred Stock that were exercisable, in whole or in part, during the March 1, 2009 through March 1, 2011, at a price of $25 per share, which resulted in a total price of $125,000 ($62,500 for David and William, respectively). D.E. 52 ¶ 48. However, David Pilger provided uncontroverted testimony that he and William Pilger "refused to issue the warrants because it might hurt the ESOP's beneficiaries" and that "no warrants have been issued." D.E. 50 ¶ 48.

On December 7, 2009, nearly ten months after the Second Stock Purchase, Ms. Lamb provided a one-page letter to the Trustees, opining that "no alteration of value [from the previous valuation of $22.75 per share as of June 30, 2008] was warranted as of February 18, 2009" (the "Fairness Opinion"). D.E. 52 ¶ 41. In the Fairness Opinion, Ms. Lamb claims to have considered "all relevant factors" and to have "discussed with management the changes in financial performance and position between the June 30, 2008 valuation date and February 18, 2009, as well as management's outlook." *Id.* Ms. Lamb claims to have found "no material changes in financial performance or position . . . which would result in a lower value for ESOP transaction purposes." *Id.*

There is conflicting evidence as to whether David Pilger requested the Fairness Opinion before or after the First and/or Second Stock Purchase. *See id.* ¶¶ 42-47; D.E. 52-1 at 89:15-23; D.E. 60-2 at 118:22-120:10. There is also inconsistent evidence concerning whether David Pilger informed Ms. Lamb of: (1) Commodity Control's financial performance after June 30, 2008 (i.e., after the valuation date used in the Valuation Report); and (2) discussions concerning Stock Warrants before Ms. Lamb prepared the Fairness Opinion. D.E. 52 ¶ 46.

Seven years later, in connection with this litigation, Plaintiff hired valuation expert Marc Brown ("Mr. Brown") to provide an opinion regarding the fair market value of Commodity Control as of January 22, 2009, which is the date of the First Stock Purchase. *Id.* ¶ 50. Mr. Brown's opinion is that Commodity Control was worth $3.831 million as of the date of the First Stock Purchase. *Id.*

Defendants hired valuation expert Andrew Bernstein ("Mr. Bernstein") to provide an opinion regarding the fair market value of the Company as of January 22, 2009. *Id.* ¶ 51. Mr.

Bernstein's opinion is that Commodity Control was worth $7.9 million as of the date of the First Stock Purchase. *Id.*

## III. Summary Judgment Standard

Summary judgment is authorized only when the moving party meets its burden of demonstrating that "the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56; *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 175 (1970). When determining whether the moving party has met this burden, the Court must view the evidence and all factual inferences in the light most favorable to the non-moving party. *Adickes*, 398 U.S. at 157; *Rojas v. Florida*, 285 F.3d 1339, 1341-42 (11th Cir. 2002).

The party opposing the motion may not simply rest upon mere allegations or denials of the pleadings; after the moving party has met its burden of proving that no genuine issue of material fact exists, the non-moving party must make a showing sufficient to establish the existence of an essential element of that party's case and on which that party will bear the burden of proof at trial. *See Celotex Corp. v. Catrell*, 477 U.S. 317 (1986); *Poole v. Country Club of Columbus, Inc.*, 129 F.3d 551, 553 (11th Cir. 1997); *Barfield v. Brierton*, 883 F.2d 923, 933-34 (11th Cir. 1989).

If the record presents factual issues, the Court must not decide them; it must deny the motion and proceed to trial. *Envntl. Def. Fund v. Marsh*, 651 F.2d 983, 991 (5th Cir. 1981).[3] Summary judgment may be inappropriate even where the parties agree on the basic facts, but

[3] Decisions of the United States Court of Appeals for the Fifth Circuit entered before October 1, 1981, are binding precedent in the Eleventh Circuit. *See Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981).

disagree about the inferences that should be drawn from these facts. *Lighting Fixture & Elec. Supply Co. v. Cont'l Ins. Co.*, 420 F.2d 1211, 1213 (5th Cir. 1969). If reasonable minds might differ on the inferences arising from undisputed facts, then the Court should deny summary judgment. *Impossible Elec. Techniques, Inc. v. Wackenhut Protective Sys., Inc.*, 669 F.2d 1026, 1031 (5th Cir. 1982); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("[T]he dispute about a material fact is 'genuine,' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.").

Moreover, the party opposing a motion for summary judgment need not respond to it with evidence unless and until the movant has properly supported the motion with sufficient evidence. *Adickes*, 398 U.S. at 160. The moving party must demonstrate that the facts underlying all the relevant legal questions raised by the pleadings or are not otherwise in dispute, or else summary judgment will be denied notwithstanding that the non-moving party has introduced no evidence whatsoever. *Brunswick Corp. v. Vineberg*, 370 F.2d 605, 611-12 (5th Cir. 1967). The Court must resolve all ambiguities and draw all justifiable inferences in favor of the non-moving party. *Liberty Lobby, Inc.*, 477 U.S. at 255.

## IV. Discussion

Plaintiff moves for summary judgment on its claims under three different provisions of ERISA. Count I alleges that Defendants breached their fiduciary duties in violation of 29 U.S.C. §§ 1104(a)(1)(A), (B), and (D) by overvaluing the Commodity Control stock sold to the ESOP through the First and Second Stock Purchases. Count II alleges that Defendants engaged in prohibited transactions under 29 U.S.C. §§ 1106(a)(1)(A), (B) and (D) because the First and Second Stock Purchases were transactions between the ESOP and David and William Pilger and, therefore, transactions "between the plan and a party in interest" presumptively barred under

ERISA. Lastly, Count III alleges that Defendants violated 29 U.S.C. §§ 1106(b)(1) and (b)(2) by dealing with the assets of the ESOP in their own interest and for their own account because their individual interests were "adverse to the interests of the plan." D.E. 38.

The Court will summarize the relevant ERISA provisions and then address the parties' arguments.

A. Governing law

"ERISA is a comprehensive statute designed to promote the interests of employees and their beneficiaries in employee benefit plans." *Morstein v. Nat'l Ins. Servs., Inc.*, 93 F.3d 715, 718 (11th Cir. 1996) (internal citations omitted). ERISA establishes "standards of conduct, responsibility and obligations for fiduciaries of employment benefit plans." 29 U.S.C. § 1001(b). In this action, there are three relevant ERISA provisions, which are ERISA Sections 404, 406 and 408.

Section 404 enumerates the fiduciary duties required of employment benefit plan trustees. 29 U.S.C. § 1104(a)(1). Courts interpreting this section have separated the duties into three components. *Id.*; *Berlin v. Michigan Bell Telephone Co.*, 858 F.2d 1154, 1162 (6th Cir. 1988). The first component "is referred to as the 'duty of loyalty,' and is codified in the requirement that 'each fiduciary of a plan must tsolely in the interests of the plan's participants and beneficiaries." *Berlin*, 858 F.2d at 1162. The second obligation imposed under ERISA is that of the "prudent man," which requires that a plan fiduciary "act with the care, skill, prudence and diligence that a prudent man acting in a like capacity would use in conducting an enterprise of a like character." 29 U.S.C. § 1104(a)(1)(B); *Berlin*, 858 F.2d at 1162. Lastly, an ERISA fiduciary must act "for the exclusive purpose" of providing benefits to plan beneficiaries. *Berlin*, 858 F.2d at 1162.

Under ERISA Section 406(a)(1), fiduciaries are categorically barred from engaging in transactions between a plan and a "party of interest" because such transactions are, by their nature, "likely to injure the pension plan." *Harris Trust & Sav. Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238, 242 (2000); *Herman v. S.C. Nat. Bank*, 140 F.3d 1413, 1416 (11th Cir. 1998). Transactions barred by ERISA Section 406(a) are *per se* prohibited "regardless of whether any harm actually results from the transaction." *Donovan v. Walton*, 609 F. Supp. 1221, 1246 (S.D. Fla. 1985), *aff'd sub nom. Brock v. Walton*, 794 F.2d 586 (11th Cir. 1986).

In addition, ERISA Section 406(b) bars transactions between a fiduciary and a plan if the fiduciary: (1) "deal[s] with the assets of the plan in his own interest or for his own account;" (2) "act[s] in any transaction involving the plan on behalf of a party . . . whose interests are adverse to the interests of the plan or the interests of its participants or beneficiaries;" or (3) "receive[s] any consideration from his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan." In other words, Section 406(b) imposes on fiduciaries a duty of loyalty and duty of care similar to duties imposed under Section 404. *See Iron Workers Local No. 272 v. Bowen*, 624 F.2d 1255, 1260 (5th Cir. 1980).

However, Section 406 does not apply to transactions which are exempt pursuant to ERISA Section 408. ERISA Section 408(e), which is the only exemption at issue here, provides, in relevant part:

> Sections 1106 and 1107 of this title shall not apply to the acquisition or sale by a plan of qualifying employer securities (as defined in section 1107(d)(5) of this title) or acquisition, sale or lease by a plan of qualifying employer real property (as defined in section 1107(d)(4) of this title)—
>
> **(1) if such acquisition, sale, or lease is for adequate consideration** (or in the case of a marketable obligation, at a price not less favorable to the plan than the price determined under section 1107(e)(1) of this title) . . . .

29 U.S.C § 1108(e) (emphasis added). In the case of "an asset other than a security for which there is a recognized market," as in this case, adequate consideration is defined as "the fair market value of the asset as determined in good faith by the trustee or named fiduciary."[3] 29 U.S.C. § 1002(18).

A party opposing a motion for summary judgment based on a Section 1108 exemption has a burden to show, by a preponderance of the evidence, that there are genuine issues of material fact regarding the exempt nature of the transaction. *Fish v. GreatBanc Trust Co.*, 749 F.3d 671, 685 (7th Cir. 2014); *see Brown v. Blue Cross & Blue Shield of Alabama, Inc.*, 898 F.2d 1556, 1566 (11th Cir. 1990) (holding that "when a plan beneficiary demonstrates a substantial conflict of interest on the part of the fiduciary responsible for benefits determinations, the burden shifts to the fiduciary to prove that its interpretation of plan provisions committed to its discretion was not tainted by self-interest"); *see also Marshall v. Snyder*, 572 F.2d 894, 900 (2d Cir. 1978) ("The settled law is that in such situations the burden of proof is always on the party to the self-dealing transaction to justify its fairness.").

B. Analysis

Plaintiff moves for summary judgment on grounds: (1) that the First and Second Stock Purchases constituted prohibited transactions under ERISA § 406(a) and (b), which were not exempt under ERISA §408; and (2) the First and Second Stock Purchases constituted breaches of Defendants' fiduciary duties under ERISA §§ 404(a)(1)(A) and (B).

---

[3] Plaintiff argues that this statutory language concerning "adequate consideration" requires Defendants to prove both that: (1) securities were sold at fair market value; and (2) Defendants acted in good faith by satisfying their fiduciary duties under Section 404. D.E. 57 pp. 10-18. In contrast, Defendants argue that the definition of "adequate consideration" requires only that Defendants prove they determined the value of Commodity Control's stock in subjective good faith, or with a "sincere intention to be honest and law-abiding." D.E. 61 p. 9. The Court, for the most part, agrees with Plaintiff for reasons set forth at *supra* pp. 15-16.

1. *Whether the transactions are exempt under ERISA § 408*

As an initial matter, Plaintiff argues that the January 22, 2009 and February 22, 2009 transactions fall within the purview of ERISA §§ 406(a) and (b), as these two transactions involved the sale of stock between fiduciaries and parties in interest in violation of subsection (a) and, moreover, violated the fiduciary duties set forth in subsection (b). D.E. 57. Defendants do not dispute that the First and Second Stock Purchases constitute a *per se* violation of Section 406(a). D.E. 61. Because the evidence unquestionably shows that these transactions were between a fiduciary and party in interest, such that the transactions were *per se* in violation of ERISA, the Court immediately addresses whether Defendants can meet their burden of proving an exemption to ERISA § 406 (a) and (b) based on ERISA § 408.

The only exemption under Section 408 raised by Defendants is under ERISA § 408(e). *See* D.E. 61 pp. 8-9. The parties strongly dispute the legal framework for proving an exemption under ERISA Section 408(e). The Court will begin with the definition of "adequate consideration" under Section 408(e), and the associated framework for determining whether the transaction was for "adequate consideration," and then analyze the record evidence in light of the requirements of Section 408(e).

a. Definition of "adequate consideration"

Plaintiff relies on case law from the Sixth, Seventh and Ninth Circuits to contend that Section 408(e)'s requirement that a transaction be for "adequate consideration" (i.e. for the "the fair market value of the asset as determined in good faith by the trustee or named fiduciary") involves a two-pronged test requiring proof that: (1) Defendants performed a "good faith investigation" of the value of Commodity Control's stock;" **and** (2) this stock was sold for "fair market value." D.E. 63 p. 2 (citing *Chao v. Hall Holdings Co., Inc.*, 285 F.3d 415 (6th Cir.

2002), *Keach v. U.S. Trust Co.*, 419 F.3d 626 (7th Cir. 2005) and *Howard v. Shay*, 100 F.3d 1484, 1489 (9th Cir. 1996)). Plaintiffs argue this two-pronged inquiry is conjunctive, so where either part of the test is not met, the exemption does not apply. *Id.*

In response, Defendants argue that the Court should rely on the plain language of ERISA Section 1108(e), rather than on non-binding decisions from other Circuits, to conclude that where "market value is determined in *good faith* . . . the transaction is not prohibited." D.E. 61 p. 10. In other words, Defendants contend that ERISA does not create a two-pronged test, but instead simply requires that market value be determined in good faith; as long as a defendant determined market value in good faith, then the exemption in Section 408(e) applies.

While the Eleventh Circuit has yet to address the issue, the Sixth, Seventh and Ninth Circuits, as well as district courts in other Circuits, have either held or strongly suggested that Section 408(e) involves a two-part inquiry into both whether the sale price was for fair market value and, more importantly, whether fiduciaries determined that value in good faith. *Chao*, 285 F.3d at 436 ("The definition of 'adequate consideration' has two distinct parts. First, there is the 'fair market value' part, then there is the 'as determined in good faith by the trustee' part."); *Keach*, 419 F.3d at 636 ("In order to rely on the adequate consideration exemption, a trustee or fiduciary has the burden to establish that the ESOP paid no more than fair market value for the asset, and that the fair market value was determined in good faith by the fiduciary."); *see Howard*, 100 F.3d at 1488-89.

The Court finds these decisions to be persuasive, especially in light of Defendants' failure to cite to contrary binding or persuasive authority from the Eleventh Circuit, for three reasons.

First, the plain language of ERISA's definition of "adequate consideration" compels the conclusion that adequate consideration requires the Court to analyze both good faith and fair

market value. Adequate consideration of "an asset other than a security for which there is a recognized market," as in this case, is defined as "**the fair market value of the asset as determined in good faith** by the trustee or named fiduciary." 29 U.S.C. § 1002(18) (emphasis added). The Eleventh Circuit has made clear that in construing statutes, courts should give effect to each word and "avoid statutory constructions that render provisions meaningless." *Bouchard Transp. Co. v. Updegraff*, 147 F.3d 1344, 1351 (11th Cir. 1998); *Woodfork v. Marine Cooks & Stewards Union*, 642 F.2d 966, 970-71 (5th Cir. Apr. 1981) ("A basic principle of statutory construction is that a statute should not be construed in such a way as to render certain provisions superfluous or insignificant." (internal quotations and citations omitted)). Doing so in this case requires that the Court give effect to language requiring that a transaction be <u>both</u> for "fair market value" <u>as well as</u> language that trustees determined such a fair market value "in good faith." *Updegraff*, 147 F.3d at 1351; *Myers v. TooJay's Mgmt. Corp.*, 640 F.3d 1278, 1285 (11th Cir. 2011) (rejecting a plaintiff's argument that the Eleventh Circuit should ignore language under 11 U.S.C. § 525 because doing so would render language "meaningless, pointless, superfluous," which is "an interpretative no-no").

Second, and perhaps more importantly, the Court relies on the existence of and reasoning contained within a proposed rule from the Department of Labor ("DOL"), issued in 1988, which sought to clarify the definition of "adequate consideration." *Keach*, 419 F.3d at 636, n.5 (citing Proposed Regulation Relating to the Definition of Adequate Consideration, 53 Fed. Reg. 17,632 (May 17, 1988) (to be codified at 29 C.F.R. § 2510–3(18)(b)); *Henry*, 445 F.3d at 618 (Sotomayor, J.) (relying on 1988 proposed DOL regulation in interpreting meaning of "adequate consideration"). While this proposed regulation was never approved for publication in the Code of Federal Regulations, the Court may, nonetheless, look to this proposed guidance; in fact, other

courts have routinely done so to interpret the meaning of "adequate consideration" under Section 408(e). *Keach*, 419 F.3d at 636, n. 5 (collecting cases); *Henry*, 445 F.3d at 619 (Sotomayor, J.) ("Although proposed regulations have no legal effect . . . numerous circuit courts have adopted the DOL's proposed definition of adequate consideration.").

In this proposed rule, DOL separated the "adequate consideration" inquiry into two distinct elements. "First, the value assigned to an asset must reflect its fair market value as determined pursuant to proposed § 2510.3–18(b)(2)." *Id.* "Second, the value assigned to an asset must be the product of a determination made by the fiduciary in good faith as defined in proposed § 2510.3–18(b)(3)." *Id.* In other words, "[t]he Department will consider that a fiduciary has determined adequate consideration in accordance with section 3(18)(B) of the Act . . . only if both of these requirements are satisfied." *Id.*

The DOL's proposed rule was based on the agency's conclusion that Congress intended to create a two-part inquiry when it defined adequate consideration under 29 U.S.C. § 1002(18). First, the DOL concluded that fair market value is an "often used concept" and that use of this common term indicated that "Congress did not intend to allow parties to a transaction to set an arbitrary value for the assets involved." Proposed Regulation Relating to the Definition of Adequate Consideration, 53 Fed. Reg. 17,632 (May 17, 1988) (to be codified at 29 C.F.R. § 2510–3(18)(b)). Second, the DOL found that Congress, nonetheless, also "intended to allow a fiduciary a limited degree of latitude so long as that fiduciary acted in [objective] good faith," which requires more than proof of "naïve or uninformed good intentions." *Id.* Third, "even if a fiduciary were to meet the good faith standards . . . there may be circumstances in which good faith alone fails to insure an equitable result." *Id.* For example, a trustee might incorrectly

calculate a valuation, resulting in sale of assets "outside of the range of acceptable valuations of a given asset." *Id.*

The Court agrees with the DOL's interpretation of Congress' intent in enacting the ERISA Section 408(e) exemption, finds it consistent with the overall purpose of ERISA, and therefore adopts the construction in the DOL's proposed regulation. *See, e.g., Jones v. Am. Gen. Life & Acc. Ins. Co.*, 370 F.3d 1065, 1071 (11th Cir. 2004) (internal citations omitted) (noting that one of the principal purposes of ERISA is to "protect . . . the interests of participants . . . and . . . beneficiaries . . . by establishing standards of conduct, responsibility, and obligation for fiduciaries . . . and . . . providing for appropriate remedies . . . and ready access to the Federal courts."); *Cunningham*, 716 F.2d at 1467 ("ERISA's requirement that ESOP fiduciaries purchase employer stock for 'adequate consideration' must be interpreted so as to give effect to the Section 404 duties to which those persons remain subject.").

Lastly, each of the cases cited by Defendants concerning whether ERISA Section 408(e) requires a two-pronged test are readily distinguishable or, in fact, comport with the Court's instant ruling. In particular, Defendants cite to *Harris v. Garner*, 216 F.3d 970, 972 (11th Cir. 2000) (en banc), which construed a provision of the Prison Litigation Reform Act of 1955 (the "PLRA"), and *Kozak v. Hillsborough County*, 644 F.3d 1347, 1349-50 (11th Cir. 2011), which construed a "motor-carrier" provision under 49 U.S.C. § 14501(a)(1)(C). These cases are, therefore, easily distinguished from the instant case.

Defendants also cite to *Cunningham*, 716 F.2d at 1467-1468, and *Perez v. Bruister*, 823 F.3d 250, 263 n. 14 (5th Cir. 2016), which together hold that a "court reviewing the adequacy of consideration under Section 3(18) is to ask if the price paid is "the fair market value of the asset *as determined in good faith by the ... fiduciary;* it is not to redetermine the appropriate amount

for itself *de novo*." *Cunningham*, 716 F.2d at 1467-68; *Perez*, 823 F.3d at 263 n. 14. In other words, the Section 408(e) exemption must be interpreted to "give effect to Section 404 duties applicable to fiduciaries, in particular the duty of care," such that a trustee cannot be granted an exemption under Section 408(e) <u>only</u> for failing to satisfy the "fair market value" prong.

The Court agrees with *Cunningham* and *Perez*, but concludes that these cases are consistent with the approach adopted by the Seventh, Sixth and Ninth Circuits, which is the approach expressly adopted herein.

This point is worth emphasizing. The Court agrees with the Fifth Circuit's conclusion in *Cunningham* and *Perez*, as well as Justice Sotomayor's conclusion in *Henry*, that "[a]lthough fair market value and good faith are often stated as distinct requirements, they are closely intertwined." *Henry*, 445 F.3d at 619. In practice, the "'fair market value' inquiry overlaps considerably with the 'good faith' inquiry; both are 'expressly focused upon the *conduct* of the fiduciaries." *Id.* (citing *Cunningham*, 716 F.2d at 1467). Or as the Seventh Circuit plainly explained, "the adequate consideration test focuses on the conduct of the fiduciaries in determining the price, not the price itself." *Eyler v. C.I.R.*, 88 F.3d 445, 455 (7th Cir. 1996); *Howard*, 100 F.3d at 1488 ("Like the inquiry into whether a fiduciary acted with loyalty and care, the inquiry into whether the ESOP received adequate consideration focuses on the thoroughness of the fiduciary's investigation.").

In other words, while it is a two-pronged inquiry, these prongs are <u>**not**</u> entirely distinct from each other, but instead in practice (and in this case) overlap. The Court's principal concern under ERISA Section 408(e)—just like the overarching concern of ERISA overall—remains whether ESOP fiduciaries satisfied their fiduciaries duties to the ESOP and its beneficiaries.

*Henry*, 445 F.3d at 619; *Chao*, 285 F.3d at 437; *Eyler*, 88 F.3d at 455; *Cunningham*, 716 F.2d at 1467.

In light of this authority and the underlying purposes of ERISA, the Court will address the record evidence under the two-pronged test, with the understanding that both prongs overlap and, moreover, that the Court must place emphasis on the conduct of Defendants as fiduciaries of the ESOP, rather than the stock price ultimately used to consummate the First and Second Stock Purchases.

b. Good faith investigation

i. *Definition of good faith under ERISA Section 408(e)*

As a threshold matter, the parties dispute what constitutes a good faith investigation under Section 408(e). Plaintiff argues a good faith investigation requires proof that Defendants "fulfill[ed] [their] duties of care and loyalty." D.E. 57 p. 11. Because Defendants relied on an independent valuation to determine the stock price for the ESOP transactions, Plaintiff, relying on *Howard v. Shay*, 100 F.3d at 1439, argues that a good faith investigation under Section 408(e) requires that Defendants show they: (1) investigated Ms. Lamb's qualifications; (2) provided Ms. Lamb with complete and accurate information; and (3) made certain that reliance on the Ms. Lamb's advice was reasonably justified under the circumstances. D.E. 57 p. 11 (citing *Howard*, 100 F.3d at 1489).

In contrast, Defendants argue that "good faith" is a matter of *subjective* intent. In other words, Defendants must have acted with the "sincere intention to be honest and law-abiding, as when negotiating a contract," to satisfy the good faith prong of ERISA Section 408(e). D.E. 61 p. 10. In support, Defendants cite to dictionary definitions and case law interpreting "good faith" in other contexts besides ERISA cases. *Id.*

The Court agrees with Plaintiff's interpretation of "good faith" under ERISA § 408(e), as numerous courts have made clear that the good faith inquiry under Section 408(e) is "not a search for subjective good faith—a pure heart and an empty head are not enough." *Cunningham*, 716 F.2d at 1467-68; *Henry*, 445 F.3d at 619-20**;** *Eyler*, 88 F.3d at 455 (holding that good faith requires a showing that fiduciaries "arrived at their determination of fair market value by way of a prudent investigation"). Instead, the good faith requirement "must be read in light of the overriding duties of Section 404 . . . [such that] ESOP fiduciaries will carry their burden to prove that adequate consideration was paid by showing that they arrived at their determination of fair market value by way of a prudent investigation in the circumstances then prevailing." *Cunningham*, 716 F.2d at 1467-68. In other words, fiduciaries must show that they satisfied their fiduciary duties under ERISA Section 404.[4] *Id.*; *Henry*, 445 F.3d at 619-20; *Chao*, 285 F.3d at 437; *Eyler*, 88 F.3d at 455; *Howard*, 100 F.3d at 1489.

ii. *Parties' arguments concerning record evidence*

Plaintiff argues that Defendants fail to proffer evidence to show that they acted in good faith because the undisputed evidence shows they: (1) did not provide Ms. Lamb with complete and accurate information; and (2) did not make certain that they could reasonably rely on Ms. Lamb's expert advice.

Plaintiff contends that Defendants failed to provide Ms. Lamb with complete and accurate information for one principal reason: while David Pilger claims to "have told Ms. Lamb that he expected 3% growth for the Company's principal business, which accounted for 70% of the Company's revenue, and expected 10-12% growth for the remaining 30% of the business,"

[4] For this reason, to determine whether there is a genuine factual dispute concerning whether Defendants acted in good faith under Section 408(e), the Court engages in the same inquiry it would to determine whether Defendants breached their fiduciary duties under ERISA Section 404. *See, e.g.*, *Chao*, 285 F.3d at 437.

Ms. Lamb's Valuation Report "includes much more aggressive forecasts of revenue growth in the next five years, far in excess of Mr. Pilger's claimed expectations and significantly in excess of the Company's growth within the past five years." D.E. 57 pp. 11-12. Plaintiff contends that this discrepancy, even construed in the light most favorable to Defendants, indicates that David Pilger either failed to provide Ms. Lamb with accurate information or failed to diligently review data pertaining to project growth that Ms. Pilger provided to Ms. Lamb. *Id.* p. 12.

Plaintiff also argues that Defendants were not reasonably justified in relying on Ms. Lamb's valuation, for four reasons. First, Plaintiff argues that Defendants could not reasonably rely on the Valuation Report because it was "seven months out of date at the time of the Stock Purchase," was based on revenue projections for the second half of 2008 "that had clearly not materialized by the time of the Stock Purchase," and did not account for the overall economic downturn in the global economy from June 2008 to December 2008. *Id.* pp. 12-13.

Second, Plaintiff argues that in February 2009, Commodity Control granted David and William Pilger stock warrants. But before executing the First or Second Stock Purchase, David and William Pilger neither (1) informed Ms. Lamb of their intent to issue stock warrants nor (2) themselves analyzed the impact of these warrants on Commodity Control's common stock. *Id.* p. 13. Because David and William Pilger knew that these stock warrants would be issued, but failed to inform Ms. Lamb, Defendants could not reasonably rely on Ms. Lamb's Valuation Report that did not account for the stock warrants.

Third, according to Plaintiff, the Fairness Opinion has no bearing on whether Defendants could reasonably rely on the Valuation Report because it: (1) was issued long after the Second Stock Purchase was complete; (2) provides no analysis or evidence supporting its conclusion; and (3) does not appear to have considered either the actual 2008 revenues or the issuance of

stock warrants in reaching in its opinion. *Id.* Thus, even if David and William Pilger had received the Fairness Opinion before engaging in the First or Second Stock Purchase, Plaintiff contends they would not have been reasonably justified in relying upon it. *Id.* p. 14.

Lastly, Plaintiff contends that David Pilger indisputably did not critically review the Valuation Report because he admitted he: (1) "was so disappointed in the value [in the Valuation Report] that . . . [he] didn't spend a lot of time looking at this and wondering;" (2) wanted Commodity Control to be valued "as high as possible;" and (3) did not notice that the Valuation Report's projected revenues for 2008 exceeded the actual realized revenues. D.E. 57 p. 15. In light of these facts, Plaintiff argues that Defendants were not justified in relying on the Valuation Report.

In response, Defendants argue that there is record evidence to create a triable issue concerning whether they conducted a good faith investigation, for two reasons. First, Defendants argue that under Eleventh Circuit precedent, David and William Pilger's decision to retain an independent expert, McGladrey and its employee, Ms. Lamb, to evaluate Commodity Control's value is enough, standing alone, to create a genuine issue of fact of a thorough investigation. D.E. 61 pp. 12-13 (citing *Ironworkers Local No. 272 v. Bowen*, 695 F.2d 531, 536 (11th Cir. 1983), *Brock v. Walton*, 794 F.2d 586, 588 (11th Cir. 1986) and *Cunningham*, 716 F.2d at 1473).

Second, Defendants argue that even if hiring an independent expert was not enough, on its own, to defeat summary judgment, they have nonetheless satisfied the three-part test for relying on independent advisors set forth by the Ninth Circuit in *Howard v. Shay*. Defendant argues this to be true for the following four reasons: (1) Ms. Lamb was indisputably qualified to provide a valuation of Commodity Control's stock; (2) Ms. Lamb testified that Defendants provided her with complete and accurate information needed to "get the job done" to determine

the value of Commodity Control's stock; (3) Defendants could justifiably rely on Ms. Lamb's approximately $9.1 million valuation  because Commodity Control had no debt, far exceeded its peers in profits and had plans to expand its business; and (4) Defendants could also reasonably rely on Ms. Lamb's valuation based on David Pilger's testimony that he read Ms. Lamb's draft report, critiqued Ms. Lamb's assumptions and, just before creating the ESOP, again asked Ms. Lamb if her valuation was accurate in light of the fact that Commodity Control had lower than expected revenues from the second half of 2008. D.E. 61 p. 14.

In other words, Defendants argue that they have met their burden of showing a triable issue of fact as to whether they acted in good faith under ERISA Section 408(e) because David and William Pilger "hired an expert, questioned that expert's conclusions, did not rely exclusively on their own business knowledge, and requested further expert advice before creating the ESOP." *Id.* p. 16.

iii. *Analysis*

After reviewing the evidence in the light most favorable to Defendants, it is clear that there are multiple factual disputes that preclude granting Plaintiff summary judgment based on the good faith prong of the ERISA Section 408(e) exemption. In fact, Plaintiff urges the Court to view the evidence in the light most favorable to Plaintiff, which it will not do. *Adickes*, 398 U.S. at 157; *Rojas*, 285 F.3d at 1341-42.

As a threshold matter, to determine whether fiduciaries have satisfied their fiduciary duties under ERISA Section 408(e), a "court's task is to inquir[e] [as to] whether the individual trustees, at the time they engaged in the challenged transactions, employed the appropriate methods to investigate the merits of the investment and to structure the investment." *See Henry*, 445 F.3d at 618. Courts should "resist the knee-jerk reflex to pronounce an investment prudent or

imprudent based on the success of the venture, for ERISA is concerned with the soundness of the decision to invest." *See Walton*, 609 F. Supp. at 1242.

For purposes of the good faith inquiry, the Court, therefore, focuses on the reasonableness of Defendants' actions in investigating the value of Commodity Control's stock—rather than whether, in hindsight, the approximately $9.1 million valuation relied on by Defendants was in fact an accurate estimate of the company's value. *Henry*, 445 f.3d at 618; *Walton*, 609 F. Supp. at 1242.

There is ample evidence from which a reasonable fact-finder could conclude that Defendants acted in good faith under Section 408(e). First, there is no reasonable dispute that McGladrey and their employee, Ms. Lamb, were qualified to provide a valuation of Commodity Control's stock. *See* D.E. 60-3 at 11:8-32:8.

There is also evidence that, when viewed in the light most favorable to Defendants, creates a genuine issue of fact as to whether Defendants provided Ms. Lamb with complete and accurate information concerning Commodity Control's financial information. There is no dispute that Defendants provided—and Ms. Lamb considered—Commodity Control's unaudited financials from January 1, 2003 to June 30, 2008 in reaching her conclusion that the company was worth approximately $9.1 million. D.E. 52 ¶ 14; D.E. 60 ¶ 14; D.E. 52-1 at 51:24-25; 52:1-25; 53:4-24. In addition, there is evidence that Defendants provided Ms. Lamb with "as much as [Ms. Lamb] thought was sufficient to get the job done," that David Pilger and Ms. Lamb had numerous "lengthy conversations" about "sales growth, expectations, [and] profitability expectations," and that Ms. Lamb thereafter gave written summaries of the company's forecasts to David Pilger for him to review. D.E. 52-1 at 44:15-45:16; D.E. 60-3 at 41:9-21. Ms. Lamb also testified that her approach in evaluating Commodity Control's value based on conversations

and unaudited financials was common in the case of "smaller privately held companies," such as Commodity Control. D.E. 52-1 at 45:17-24. This record evidence is more than enough for Defendants to meet their burden of proving, by a preponderance of the evidence, that there is a genuine factual dispute concerning whether Defendants provided Ms. Lamb with complete and accurate information.

A reasonable fact-finder could also find that Defendants were reasonably justified in relying on the Valuation Report's conclusions based on a June 30, 2008 valuation of the company—even though Defendants consummated the relevant transactions on January 22, 2009 and February 22, 2009. David Pilger testified that he came up with the June 30, 2008 date for the valuation because the company created "two statements a year, one in January and one [in the] end of June," and when Ms. Lamb was retained in September 2008 (as well as when the Valuation Report was finalized on December 10, 2008), the June 2008 figures were the most recent figures available to the company. D.E. 60-2 at 52:13-23. David Pilger also testified that he could not accurately update the June 2008 figures based on Commodity Control's integrated systems, which the company used to keep track of inventory and sales on a routine basis, because these databases did not account for "pilferage," "spoilage," or other factors that could render the inventory and sales figures inaccurate. *Id.* at 53:2-23. Mr. Pilger, therefore, testified that he would not have recommended Ms. Lamb use post-June 2008 figures because he did not "have confidence in them" and, instead, viewed the June 2008 figures as the most accurate data from the company until it compiled the next report in January 2009. *Id.* This evidence, construed in the light most favorable to Defendants, indicates that Defendants might have been reasonable in

relying on Ms. Lamb's June 2008 valuation of Commodity Control for the January 2009 and February 2009 stock transactions.[5]

Lastly, there is evidence concerning the December 7, 2009 Fairness Opinion that, when viewed in the light most favorable to Defendants, creates a genuine issue of fact as to whether Defendants were justified in relying on Ms. Lamb's approximately $9.1 million valuation. In particular, David Pilger testified that he: (1) requested the Fairness Opinion before the February 22, 2009 stock transaction; and (2) discussed Commodity Control's sales during the second half of 2008 with Ms. Lamb in an oral conversation. D.E. 60-2 at 118:22-120:10.

In fact, the Fairness Opinion itself supports David Pilger's testimony by stating, in relevant part:

> In order to opine on the fairness of such a transaction price, **we discussed with management the changes in financial performance and position between the June 30, 2008 valuation date and February 18, 2009**, as well as management's outlook . . . **[and] found that no material changes in financial performance or position had occurred during that time period which would result in a lower value for ESOP transaction purposes.**
>
> . . .
>
> **It is our opinion that no alteration of value was warranted as of February 18, 2009.**

D.E. 52-4 p. 1 (emphasis added). The Fairness Opinion clearly indicates that Ms. Lamb considered Commodity Control's subpar sales during the second half of 2008 and, nonetheless, continued to value Commodity Control's stock at approximately $9.1 million. *Id.* While M.s Lamb testified that she did not recall any conversations with David Pilger concerning

---

[5] The Court also rejects Plaintiff's argument that Defendants could not rely on the Valuation Report because it failed to account for stock warrants to be issued by Commodity Control, as there is: (1) conflicting record evidence as to whether David and William Pilger even intended to issue stock warrants; and (2) undisputed evidence that stock warrants were, in fact, never issued. D.E. 60 ¶ 48; D.E. 60-2 at 124:8-125:4.

Commodity Control's June 2008 through December 2008 sales, D.E. 52-1 at 89:15-23, the Court finds that David Pilger's testimony and the Fairness Opinion are enough for a reasonable fact-finder to conclude that Defendants were justified in relying on Ms. Lamb's Valuation Report.

For these reasons, Plaintiff is not entitled to Plaintiff summary judgment based on the good faith prong of ERISA Section 408(e). *See, e.g.*, *Henry*, 445 F.3d at 618 (reversing judgment and remanding for district court to "determine whether a prudent fiduciary" would have detected errors in valuation of a company prior to an ESOP transaction).

c. Fair market value

Alternatively, Plaintiff argues he is entitled to summary judgment on his ERISA claims on grounds that the exemption in Section 408(e) does not apply, solely because the undisputed evidence shows that as of the date of the First Stock Purchase, 100% of Commodity Control's stock had a fair market value below $9.1 million. D.E. 57 p. 10. In other words, Plaintiff asks the Court to grant him summary judgment based **solely** on the fair market value prong of the "adequate consideration" test under ERISA Section 408(e).

Plaintiff relies on Defendants' own expert report, which states that Commodity Control's stock was worth $7.9 million as of January 22, 2009, to support his argument that the ESOP paid more than fair market value for 100% of Commodity Control's stock in January and February 2009. In short, Plaintiff contends that while there is "conflicting evidence regarding the actual fair market value of the Company at the time of the Stock Purchase . . . even considering the evidence in the light most favorable to Defendants, the ESOP overpaid for the Company stock by at least $1.2 million." *Id.* Plaintiff argues that Defendants' expert report, standing alone, precludes Defendants from qualifying for the Section 408(e) exemption as a matter of law. *Id.*

In response, Defendants argue that their reliance on independent experts, combined with their good faith actions in obtaining a valuation of Commodity Control, precludes the Court from granting Plaintiff summary judgment on the Section 408(e) exemption.

The Court finds that Plaintiff is not entitled to judgment as a matter of law strictly based on Defendants' expert's valuation of Commodity Control finalized on October 3, 2016—over seven years after the relevant transactions. As already explained, and as emphasized by the Eleventh Circuit and other Circuits, the underlying purpose of ERISA and the Section 408(e) exemption is to "protect . . . the interests of participants . . . and beneficiaries . . . by establishing standards of conduct, responsibility, and obligation for fiduciaries." *Jones*, 370 F.3d at 1071 (noting that ERISA Section 404(a) "obligates fiduciaries to discharge their duties 'solely in the interest of the participants and beneficiaries'"); *Henry*, 445 F.3d at 619 ("The role of courts in reviewing the adequacy of consideration in an ERISA case is to determine whether the fiduciary can show that the price paid represented a good faith determination of the fair market value of the asset, not to redetermine the appropriate amount for itself *de novo*." (internal citation omitted)); *Chao*, 285 F.3d at 437; *Eyler*, 88 F.3d at 455 (noting that while the adequate consideration test is two-pronged, it "focuses on the conduct of the fiduciaries in determining the price, not the price itself").

This purpose is codified in ERISA Section 408(e)'s exemption, as made clear in the U.S. Court of Appeals for the Fifth Circuit's decision in *Donovan v. Cunningham*:

> ERISA's requirement that ESOP fiduciaries purchase employer stock for 'adequate consideration' must be interpreted so as to give effect to the Section 404 duties to which those persons remain subject. In this regard, it is especially significant that the adequate consideration test, like the prudent man rule, is expressly focused upon the *conduct* of the fiduciaries. A court reviewing the adequacy of consideration under Section 3(18) is to ask if the price paid is 'the fair market value of the asset *as determined in good faith*

> *by the ... fiduciary;'* it is not to redetermine the appropriate amount for itself *de novo.*

*Cunningham*, 716 F.2d at 1467 (emphasis in original). Courts are, therefore, repeatedly warned to refrain from looking back at a transaction, well after the fact, to determine whether a stock beneficiary plan acquired stock at a hypothetically correct or fair price. *Henry,* 445 F.3d at 619; *Chao*, 285 F.3d at 437; *Eyler*, 88 F.3d at 455; *Cunningham*, 716 F.2d at 1467.

Accordingly, the record evidence showing that Commodity Control was likely worth between approximately $3.8 million and $7.9 million at the time of the January 22, 2009 stock transaction, while undoubtedly relevant to Defendants' ability to prove the Section 408(e) exemption at trial, is insufficient to warrant granting Plaintiff judgment as a matter of law, especially in light of the extensive record evidence indicating that Defendants satisfied their fiduciary obligations imposed under ERISA.[6] D.E. 52 ¶¶ 50, 51; *supra* pp. 19-23.

For these reasons, Defendants have, at this stage, met their burden of proving a triable issue of fact as to whether the First and Second Stock Purchases qualify for an exemption under Section 1108(e).

2. Whether Plaintiff is entitled to summary judgment under ERISA Section 404(a)(1)(A) and (B)

Count I alleges a claim under 29 U.S.C. §§1104(a)(1)(A) and (B) for breaches of Defendants' fiduciaries duties under ERISA. While Count I is not subject to the ERISA Section 408(e) exemption, the fiduciary duties required under ERISA Section 404 are akin to those required under the "good faith" prong of the Section 408 exemption. *See, e.g.*, *Chao,* 285 F.3d at 437. Accordingly, for the reasons discussed in Section IV.B.1.b.iii, *supra* pp. 19-23, the Court

[6] This is underscored by the fact that the parties have not identified, and the Court has been unable to find, any case either granting or denying summary judgment under ERISA Section 408(e) based solely on evidence that parties consummated a stock transaction at a price below fair market value. D.E. 57; D.E. 61; D.E. 63; D.E. 64-2.

finds that there are genuine issues of material fact concerning whether Defendants violated ERISA Section 404. *Id.* Accordingly, it is

ORDERED AND ADJUDGED that Plaintiff's Motion, D.E. 57, is DENIED.

DONE AND ORDERED in Chambers at Miami, Florida, this _7th_ day of March, 2017.

URSULA UNGARO
UNITED STATES DISTRICT JUDGE

copies provided: counsel of record